IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| KANSAS CITY SOUTHERN RAILWAY COMPANY and NORFOLK SOUTHERN RAILWAY COMPANY, ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | No. 09-3094 |
| BRADY LEE BORROWMAN, et al., ) ) ) | |
| Defendants. ) | |

<u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This cause is before the Court on Plaintiffs' Motion for Preliminary Injunction (d/e 8). On May 29, 2009, the Court held a hearing on this Motion. Subsequently, both parties submitted briefs discussing the evidence and issues involved. For the reasons stated below, the Motion is denied. The Court finds that the assessment at issue is a tax, but that Plaintiffs failed to establish the propriety of a preliminary injunction.

<u>FACTS</u>

Plaintiffs Kansas City Southern Railway Company (Kansas City

Southern) and Norfolk Southern Railway Corporation (Norfolk Southern) operate interstate railroads that cross through Illinois. Defendants Brady Lee Borrowman, Russell E. Koeller, and Dan Lundberg serve as commissioners of Defendant Sny Island Levee Drainage District (Sny Island), which is a subdivision of the State of Illinois organized to construct and operate a system to provide surface water control to certain areas of land. Defendant Michael H. Reed serves as Sny Island's superintendent and treasurer. Illinois granted Sny Island the power to levy assessments against land owners within its boundaries to fund operations, and a recent annual assessment increase forms the basis of this suit.

For purposes of this Motion, and from the evidence submitted at the hearing and with the subsequent briefs, the Court finds the following facts. For all assessment years preceding 2009, Sny Island assessed landowners within its boundaries using the same methodology for all: it divided its operating budget by the number of benefitted acres and then assessed a per acre fee for each landowner based on the number of acres owned, with an adjustment of the dollars an acre fee per tract for elevation. It did not distinguish among residential, industrial, commercial, and agricultural land, other than to assess land within a municipality at a flat fee of $5 per lot

2

without adjustment for elevation. For all of these pre-2009 assessment years, Sny Island assessed Kansas City Southern and Norfolk Southern in line with all other landowners for their proportionate shares of the operation costs.

For 2009, however, Sny Island changed its assessment method. First, it opted not to assess any amount to the lands within the municipal limits of a village or town; it found that the costs of mailing out the assessment materials to these landowners and collecting from them outweighed the benefits it would incur from them. Second, regarding lands outside municipal limits, it adopted a two-category approach. In one category were residential, commercial, and agricultural lands. In the other category were lands owned by railroads, pipelines, and utilities, which Sny Island classified as industrial lands.

Approximately 700 landowners own property within the Sny Island boundaries. The vast majority of the approximately 692 non-industrial properties are agricultural. Sny Island considered fourteen of these 692 landowners to be commercial and a handful to be residential. Only eight landowners fell within the industrial category. Kansas City Southern and Norfolk Southern were among them. The industrial category included only

3

railroads, pipelines, and utilities.

Having divided the lands it intended to assess into two categories, Sny Island then used two different methods to calculate the appropriate 2009 assessment for each landowner. For the residential, commercial, and agricultural lands, it merely added $10.00 per acre to its 2008 assessment amount. It is unclear how Sny Island settled on this $10.00 per acre increase. Sny Island's corporate designee testified that Sny Island assumed an average benefit to each acre for the services provided by the drainage district of $280.00. The corporate designee did not know how Sny Island estimated $280.00 per acre of benefit, however. The corporate designee testified that Sny Island's commissioners provided their attorneys their opinion regarding the extent to which the drainage system increased the cash rent and market value of the benefitted land, and the attorneys then recommended the $280.00 figure. The parties have presented the Court no evidence on how the Sny Island commissioners assessed the cash rent and market value of the non-industrial land or how they determined the benefit the drainage system provides to these lands. Further, it is not clear how the $280.00 figure relates to a $10.00 per acre increase.

For the industrial lands, Sny Island had its attorneys estimate how

much the industrial landowners would have to pay to repair damage to their land if a flood were to occur without the drainage levees and how much of a financial loss they would suffer if they could not use their land because of a flood. For the railroads, the attorneys developed assumptions regarding the type of damage the train tracks would sustain, the length of track that would sustain damage, and the costs of various aspects of repair. Using this methodology, Sny Island calculated a benefit amount for each industrial landowner. It then multiplied that amount by 6.6% to set an assessment amount. It is unclear why Sny Island settled on a 6.6% assessment rate for the industrial landowners.[1]

According to Sny Island's corporate designee, it only analyzed the economic benefits to particular landowners in the industrial category. It did not make individual investigations of the benefits each of the residential, commercial, and agricultural landowners enjoyed. The corporate designee conceded that Sny Island could have calculated individual benefits for each

---

[1] The parties presented the Court no evidence of *why* Sny Island selected a 6.6% figure, but they did explain *how* it settled on that number. Sny Island found that its services provided the industrial lands a total benefit of $5 million and the residential, commercial, and agricultural lands a total benefit of $27 million (though how it reached this figure is also unclear), for a combined total benefit of $32 million. Sny Island's 2009 operating budget is $2.1 million, and it divided this number by $32 million to get 6.6%.

5

landowner, but it opted not to do so.

Based on the industrial land methodology, Sny Island imposed a substantially higher increase on Kansas City Southern and Norfolk Southern than either would have received had it been a residential, commercial, or agricultural landowners. Had these companies received assessments under the non-industrial methodology, Kansas City Southern would have been obligated to pay $3,897.14. Instead, Sny Island imposed an assessment of $85,544.26. Similarly, Norfolk Southern would have been obligated to pay $2,578.26. Instead, Sny Island imposed an assessment of $93,917.34. These figures represent thousand-fold increases over the previous year: Kansas City Southern's rate increased 4,700 percent, and Norfolk Southern's rate increased 8,000 percent.

On October 9, 2008, a Pike County court ordered the annual assessment as Sny Island proposed. The payments were due June 1, 2009, but at the hearing on this Motion, Defendants agreed to waive any late fees until after this Court ruled. Thus, Plaintiffs have not yet paid the 2009 assessment. They allege that Defendants' assessment against them violates the Railroad Revitalization and Regulatory Reform Act, which prohibits state and local governments from discriminating against railroads by taxing

railroad property more heavily than other commercial property. 49 U.S.C. § 11501. They ask the Court to enjoin the collection of the approved assessment.

## ANALYSIS

Congress enacted the Railroad Revitalization and Regulatory Reform Act, referred to as the "4-R Act," in 1976 to halt the economic decline of the railroad industry. CSX Transp., Inc. v. Georgia State Bd. of Equalization, 552 U.S. 9, 128 S.Ct. 467, 469-70 (2007). It "recognized that the railroads are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation who cannot easily remove themselves from the locality." Duluth, Missabe & Iron Range Ry. Co. v. State of Wis., 100 F.3d 69, 70 (7th Cir. 1996) (quotation marks omitted). To combat this danger, the 4-R Act prohibits four separate forms of discriminatory taxation. CSX Transp., 128 S.Ct. at 470. States may not:

> (1)  Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2)  Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11501(b). The first three subsections prohibit discriminatory property taxes. Burlington Northern, Santa Fe Ry. Co. v. Lohman, 193 F.3d 984, 985 (8th Cir. 1999). The fourth subsection is a "catchall" provision not tied to property value. Norfolk S. Ry. Co. v. Ala. Dept. of Revenue, 550 F.3d 1306, 1311 (11th Cir. 2008). Plaintiffs allege that Sny Island's 2009 assessment violates subsection (4). See Amended Complaint (d/e 18), ¶ 14.

I. TAXES

While this subsection does not address *property* taxes, it still limits its prohibition to discriminatory taxes. Defendants argue that the assessments at issue here are not taxes, but Plaintiffs dispute this characterization. The 4-R Act does not define a "tax," leaving it to courts to determine whether any given fee qualifies. Wheeling & Lake Erie R. Co. v. Public Utility Com'n of Com. of Pa., 141 F.3d 88, 94 (3d Cir. 1998). Nothing in the

8

legislative history of the 4-R Act assists the Court in this decision. Id. at 95.

Additionally, whether Illinois considers drainage district special assessments to be taxes is irrelevant. Whether the assessment here constitutes a tax is a matter of federal law. See Carpenter v. Shaw, 280 U.S. 363, 367-68 (1930); Nat'l R.R. Passenger Corp. v. Com. of Pa. Public Utility Com'n, 848 F.2d 436, 439 (3d Cir. 1988) (holding that "the meaning of the word 'tax' was a matter of federal law deduced from congressional policy underlying the statute, rather than from state tax labels developed in an entirely unrelated legal context"). Both parties have provided the court Illinois decisions favoring their interpretations of the assessment here. Compare Carlyle v. Bartels, 146 N.E. 192, 193 (Ill. 1924) (holding that drainage district special assessments are not taxes) with Hunt Drainage Dist. v. Harness, 148 N.E. 44, 45 (Ill. 1925) (observing that a drainage district's special assessments are taxes). Yet, because federal law controls, these decisions are unpersuasive.

While the federal courts have not addressed this issue with an assessment exactly like this one, their decisions provide some guidance. In an old, pre-4-R Act case, the United States Supreme Court defined a drainage district's assessment collected to fund the drainage district's

9

activities and general budget as a tax. Houck v. Little River Drainage Dist., 239 U.S. 254, 259-60, 265 (1915). According to the Court:

> A tax is an enforced contribution for the payment of public expenses. It is laid by some rule of apportionment according to which the persons or property taxed share the public burden, and whether taxation operates upon all within the state, or upon those of a given class or locality, its essential nature is the same. The power of segregation for taxing purposes has every-day illustration in the experiences of local communities, the members of which, by reason of their membership, or the owners of property within the bounds of the political subdivision, are compelled to bear the burdens both of the successes and of the failures of local administration. When local improvements may be deemed to result in special benefits, a further classification may be made and special assessments imposed accordingly; but even in such case there is no requirement of the Federal Constitution that for every payment there must be an equal benefit. The state in its discretion may lay such assessments in proportion to position, frontage, area, market value, or to benefits estimated by commissioners. And, as we have said, unless the exaction is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property, it cannot be maintained that the state has exceeded its taxing power.

Id. at 265 (internal citations omitted). The tax in Houck was a flat 25 cents per acre, regardless of land value or how much the drainage district's work would benefit each parcel of land. Id. at 259-60.

Moreover, in a case following Houck and also preceding the 4-R Act, the Supreme Court struck down a road improvement district's benefit-based

10

special assessment as so discriminatory it violated the plaintiff's equal protection rights under the Fourteenth Amendment. See <u>Kansas City Southern Ry. Co. v. Road Improvement Dist. No. 6</u>, 256 U.S. 658 (1921). The Court described the district's method of calculating its assessments as follows:

> The statute under consideration prescribes no definite standard for determining benefits from proposed improvements. The assessors made estimates as to farm lands and town lots according to area and position and wholly without regard to their value, improvements thereon, or their present or prospective use. On the other hand, disregarding both area and position, they undertook to estimate benefits to the property of plaintiffs in error without disclosing any basis therefor, but apparently according to some vague speculation as to present worth and possible future increased receipts from freight and passengers which would enhance its value, considered as a component part of the system.

<u>Id.</u> at 660-61. Like in <u>Houck</u> and the case at bar, the district in <u>Kansas City Southern Railway Co. v. Road Improvement District No. 6</u> levied assessments against the railroads to fund its general budget and calculated these assessments based on the district's estimate of its improvements' worth to the railroads.[2] <u>Id.</u> at 659, 661. The Court considered these

---

[2] The Court notes that the road improvement district in <u>Kansas City Southern Railway Co. v. Road Improvement District No. 6</u> apparently was created only to construct an 11.2-mile gravel road, but this district is distinguishable from a district that constructs and maintains numerous improvements and levies assessments on individual

11

assessments to be taxes. Id. at 659.

In contrast, before deciding Houck and Kansas City Southern Railway Co. v. Road Improvement District No. 6, the Supreme Court concluded that another special assessment for a particular local improvement was not a "tax[] proper," and exemption from taxation applies only to "taxes proper." Illinois Central Railway Co. v. City of Decatur, 147 U.S. 190, 199 (1893). In Illinois Central, the city of Decatur graded and paved a street and levied a special assessment on the contiguous property owners to fund this improvement. Id. at 190. The Supreme Court held that this assessment was not a tax proper because it was not a contribution to the state or city "for the purpose of enabling either to carry on its general administration of affairs," but instead was a charge "only, and specially, for the cost for a local improvement supposed to have resulted in the enhancement of the value of the railroad company's property." Id. at 209.

Congress is presumed to have been aware of these cases when it enacted the 4-R Act. See Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). Given this presumption, Congress' failure to exempt, from the

---

landowners on a project-by-project basis.

category of taxes covered by § 11501(b)(4), special assessments used to fund districts' general operating budgets, as opposed to particular projects, suggests that the drafters intended § 11501(b)(4) to cover these assessments.

In 4-R Act cases specifically, the Eighth and Third Circuits have concluded that district special assessments levied to fund a particular project and imposed only on those who benefit from the project do not constitute taxes, but the project-based assessment methods in their cases differ from the assessment method at bar.  In <u>Chicago and North Western Transportation Co. v. Webster County Board of Supervisors</u>, the plaintiff railroad had a right-of-way that crossed a ditch maintained by a drainage district.  <u>Chicago and North Western Transp.</u>, 71 F.3d 265, 265 (8th Cir. 1995).  As part of a project to widen the ditch through the railroad's right-of-way, the district installed a new culvert and assessed the railroad for the full cost of the culvert.  <u>Id.</u>  According to the Eighth Circuit, the assessment in this case was not a tax under the 4-R Act because it constituted only a "reimbursement for building a culvert that benefits the railroad alone." <u>Id.</u> at 267.  The Eighth Circuit held that this fact alone distinguished the assessment from a tax, but the court also noted that at the time Congress

13

enacted the 4-R Act, "many states had statutes requiring railroads to construct improvements, including culverts, when drainage ditches crossed their rights-of-way." Id. Because nothing in the 4-R Act indicates that Congress wanted to undermine those existing state statutes, the Eighth Circuit concluded that it did not intend to do so. Id. at 268.

Similarly, in Wheeling & Lake Erie Railway Co., a public utility commission assessed a railroad for a portion of the construction and maintenance costs of a bridge intersecting its right-of-way. Wheeling & Lake Erie Railway Co., 141 F.3d at 90. The Third Circuit held that this assessment was not a tax under the 4-R Act. Id. at 96. It reasoned that because the 4-R Act benefits only private entities, it must be interpreted strictly. Id. at 95. The court held that under a strict interpretation, a fee is a tax under this statute only "if it was the clear and manifest purpose of Congress to include such assessments." Id. Because bridge improvement assessments were common at the time Congress enacted the 4-R Act, and Congress did not explicitly include such assessments in the 4-R Act, it must have intended to exempt them, the court reasoned. Id. at 96. The Third Circuit also held that whether a given project benefits only one landowner or benefits many is irrelevant in deciding whether the related assessments

14

are taxes. Id. at 97. The fact that benefitted owners are assessed only a portion of a project's costs does not make the assessments taxes. Id.

These Eighth and Third Circuit cases are distinguishable from the one now before this Court. Here, the Sny Island assessment is intended to raise money to fund all of the district's expenses and improvements; the assessment funds the district's budget for the year. The assessments in Chicago and Northwestern and Wheeling were project-specific. They did not contribute toward the districts' general operating budgets, and the districts did not have discretion to use the funds collected for any improvements they deemed necessary within the districts. Here, Sny Island appears to have the discretion to spend the funds it collects on any of the work it performs. This makes the assessment at issue here a contribution for the payment of public expenses. It is a tax.

II.     PRELIMINARY INJUNCTIONS

Though the assessment at issue is a tax, a preliminary injunction is not appropriate. Plaintiffs contend that the 4-R Act sets out its own standard for a preliminary injunction. In 49 U.S.C. § 11501(c), the Act provides:

> Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with

15

> other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value and true market value is governed by State law. If the ratio of the assessed value of other commercial and industrial property in the assessment jurisdiction to the true market value of all other commercial and industrial property cannot be determined to the satisfaction of the district court through the random-sampling method known as a sales assessment ratio study (to be carried out under statistical principles applicable to such a study), the court shall find, as a violation of this section --
>
> (1) an assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property subject to a property tax levy in the assessment jurisdiction has to the true market value of all other commercial and industrial property; and
>
> (2) the collection of an ad valorem property tax on the rail transportation property at a tax rate that exceeds the tax ratio rate applicable to taxable property in the taxing district.

Under this section, the Court may not prevent a violation of the Act without evidence of the ratio between true market value and assessed value. Yet Plaintiffs have alleged a violation of subsection (4), which is not confined to property taxes, and they have provided no evidence of true market value. Such evidence is unnecessary to prove a violation of §

11501(b)(4), but the Court cannot order a preliminary injunction under § 11501(c) without it.  Indeed, it appears that § 11501(c) applies only to discriminatory property taxes, and therefore it does not assist Plaintiffs here.

Moreover, considering the case under the general common law standard for preliminary injunctions, Plaintiffs have not met their burden. See Norfolk Southern R. Co. v. Alabama Dept. of Rev., 2008 WL 6515212, at *5 (N.D. Ala. Apr. 9, 2008) (applying the general common law preliminary injunction standard in a § 11501(b)(4) case).  Under this standard, a preliminary injunction is proper only where the plaintiff can demonstrate "that irreparable injury is *likely* in the absence of an injunction." Winter v. Natural Resources Defense Council, Inc., __ U.S. __, 129 S.Ct. 365, 377 (2008) (emphasis in original).  Plaintiffs have not done so here.  They have provided no evidence of a possible irreparable injury, let alone a likely one.  Indeed, where money can make up for a potential loss, no irreparable injury will occur.  Bedrossian v. Northwestern Memorial Hosp., 409 F.3d 840, 845 (7th Cir. 2005); In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003).  Here, only the money which Defendants have assessed Plaintiffs is at risk, and the loss of this money is not irreparable. Plaintiffs are not entitled to a preliminary injunction.

THEREFORE, Plaintiffs' Motion for Preliminary Injunction (d/e 8) is DENIED.

IT IS THEREFORE SO ORDERED.

ENTER:   August 18, 2009

    FOR THE COURT:

                                  s/ Jeanne E. Scott
                                  JEANNE E. SCOTT
                      UNITED STATES DISTRICT JUDGE