IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KANSAS CITY SOUTHERN RAILWAY COMPANY and NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 09-3094 |
| BRADY LEE BORROWMAN, et al., | ) ) ) ) | |
| Defendants. | ) | |

OPINION

JEANNE E. SCOTT, U.S. District Judge:

This cause came before the Court on April 6, 2010, for a bench trial. Plaintiff Kansas City Southern Railway Company (KCSR) appeared by its counsel Paul M. Brown, and Plaintiff Norfolk Southern Railway Company (NSR) appeared by its counsel Everett B. Gibson. Defendants Brady Lee Borrowman, Russell E. Koeller, Dan Lundberg, Michael H. Reed, and Sny Island Levee Drainage District (Sny Island or District) appeared by their counsel Harry B. Wilson and JoAnn Tracy Sandifer. At the conclusion of the trial, the Court took the matter under advisement. The parties have

1

submitted proposed findings of fact, conclusions of law, and post-trial briefs. See Plaintiffs' Amended Proposed Findings of Fact, Conclusions of Law, and Form of Judgment (d/e 71); Plaintiffs' Post Trial Brief (d/e 72); Defendants' Amended Proposed Findings of Fact and Conclusions of Law (d/e 70); Defendants' Post-Trial Brief (d/e 73).

The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. See Fed. R. Civ. P. 52(a)(1). For the reasons set forth below, the Court enters judgment in favor of Defendants and against Plaintiffs.

## FACTS

In 1880, the Circuit Court of Pike County, Illinois (Pike County Court), organized Defendant Sny Island to design, construct, and operate a levee and drainage system that would protect the lands within its borders from flooding. Today, Sny Island functions pursuant to the Illinois Drainage Code, 70 ILCS 605/1-1 et seq. Sny Island is approximately 60 miles long, encompassing roughly 113,396 acres of land located in Adams County, Calhoun County, and Pike County. Of these lands, 99.5 percent are devoted to agricultural use. The remaining lands consist of residential, commercial, utility, and pipeline properties. Plaintiffs, who operate

interstate railroads that cross through Sny Island, are 2 of 700 landowners within the District's boundaries. KCSR and NSR own 212.32 and 145.17 acres, respectively, within the District.

Defendants Borrowman, Koeller, and Lundberg, are commissioners of Sny Island, and Defendant Reed is Sny Island's superintendent and treasurer. The Illinois Drainage Code empowers Sny Island's commissioners to "levy assessments upon the lands and other property benefited [sic] to pay the cost thereof and the expenses incident thereto." 70 ILCS 605/4-18. The Pike County Court has authorized the commissioners to levy an annual assessment against benefitted lands. If the commissioners want to increase the annual maintenance assessment, they must petition the Pike County Court for authority to do so. 70 ILCS 605/4-19.

Prior to 2009, Sny Island assessed landowners within its boundaries by one method: it divided its operating budget by the number of benefitted acres, and then assessed a per-acre fee to each landowner based on the number of acres owned, with a per-tract elevation adjustment. Sny Island did not distinguish among residential, industrial, commercial, and agricultural lands, beyond assessing lands within a municipality a flat $5 fee per lot without adjustment for elevation. Prior to 2009, Sny Island assessed

3

KCSR and NSR in this manner.

However, in 2009 Sny Island altered its assessment method. Heavy rainfall and flooding of the Mississippi River in the spring and early summer of 2008 had forced the District to operate at heightened levels, sandbagging, patrolling, and pumping water almost continuously for several months. During this same time period, the price of diesel fuel, which the District used to operate the pumps, went up significantly, putting an even greater strain on the District's financial resources. The revenue from the annual maintenance assessments was insufficient to meet Sny Island's financial needs, and the commissioners were forced to tap into the District's emergency reserve. By the summer of 2008, the District's emergency reserve was nearly depleted. The commissioners decided that they needed to raise the annual maintenance assessment in order to keep the District operating.

The commissioners met on February 12, 2008, and voted to develop a new assessment method in conjunction with David Human, an attorney from St. Louis, Missouri. On March 27, 2008, the commissioners met again and proposed a $5-per-acre, elevation-adjusted assessment increase for lands not owned by railroads, pipelines, and utilities. The commissioners also

4

decided that they would assess lands owned by railroads, pipelines, and utilities (RPU) on a benefit basis, as opposed to a per-acre basis.[1] The commissioners anticipated that Sny Island's operating budget for 2009 would be approximately $1.5 million, a $650,000 increase from the 2008 operating budget.

On April 3, 2008, the commissioners met, affirmed their decision to assess RPU lands on a benefit basis, and voted to increase the assessment on other lands by $5 per acre. The commissioners decided not to assess any amount to lands within municipalities because the costs of mailing the assessment materials and collecting the assessment monies were greater than the potential assessment revenue. The commissioners believed that all commercial and industrial properties within the District, with the exception of RPU lands, fell within municipal limits.

The commissioners met again on June 10, 2008, and decided that they would need even more revenue than initially estimated for the 2009 operating budget. The commissioners estimated that they would need to generate $1.3 million more in 2009 than in 2008. They voted to rescind

---

[1] The commissioners also decided to exempt not-for-profit utilities from the annual maintenance assessments.

5

the $5-per-acre increase for non-RPU lands, and decided to increase the assessment on these lands by $10 per acre. Approximately 692 of the 700 landowners within Sny Island's boundaries fell within this category. Most of the non-RPU properties were agricultural, while 14 were commercial and a few were residential. The non-RPU lands' average assessment increased from $8.50 per acre in 2008 to $18.50 per acre in 2009.

On July 31, 2008, the commissioners had a telephone conference with Human to discuss the assessment methodology for RPU lands. After this conversation, and for reasons that are still unclear to the Court, Human calculated that the District provided a $280-per-acre benefit to non-RPU lands, based on average market values, cash rent projections, and capitalization assumptions. Human prepared worksheets for the commissioners, who met again on August 1, 2008, to discuss the projected benefits the District provided to RPU lands.

To determine the benefit RPU lands derived from Sny Island, Human assumed a hypothetical flood without the benefit of drainage levees, and then determined on an individual basis how much money the property owners would need to expend to repair structural damage, and how much financial loss they would suffer if their lands became unusable due to the

6

flood. Human then multiplied the benefit by an assessment ratio of 6.6 percent. He came up with this percentage by dividing the average per-acre assessment for non-RPU lands in 2009 ($18.50) by the per-acre benefit derived by non-RPU lands ($280). Using the 6.6 percent ratio, the proposed total assessment for RPU lands in the District was $423,926.07. Under this analysis, the District would have levied a $110,958.07 assessment against KCSR, and a $122,761.51 assessment against NSR. However, the commissioners instructed Human to refine the assessment.

When all was said and done, the District proposed an annual maintenance assessment of $85,544.26 for KCSR, and a $93,917.34 assessment for NSR.[2] KCSR's 2008 assessment had been $1,773.94, and NSR's 2008 assessment had been $1,126.56; KCSR's assessment rate increased 4700 percent, and NSR's rate increased 8000 percent. Had Plaintiffs' lands been assessed in the same manner as the non-RPU lands, the assessments would have been $3,897.14 and $2,578.26, respectively.

Other commercial and industrial property owners outside of municipal limits were assessed differently than Plaintiffs. These six commercial or

---

[2]Plaintiffs' assessments ended up being lower than initially proposed because Human revised the assumptions in the worksheets regarding how frequently Plaintiffs' embankments would incur scour damage.

industrial properties were: Mississippi Valley Lodging; Cropmate Co.; Two Rivers FS, Inc.; Soyland Power Cooperative, Inc.; TMLX, Inc.; and David Buchanan's Dozer & Backhoe. These lands were assessed in the same manner as the non-RPU lands; their assessments increased $10 per acre over the 2008 assessment amount. Defendants admit that they "overlooked a handful of other commercial and industrial properties when adopting the new methodology for 2009, all of them small 'Mom and Pop' type operations." Defendants' Post-Trial Brief, p. 3. Defendants state that they made this mistake because of the tremendous amount of stress the commissioners were under trying to fight flooding in the District during the spring and summer of 2008.

The District filed a petition seeking approval of the proposed assessment increase with the Pike County Court on August 22, 2008. The commissioners subsequently mailed a notice to all landowners in the District, noting that the proposed changes "would generally result in a maximum of $10.00 per acre increase in annual drainage assessments to benefited [sic] agricultural land in the District." Plaintiffs' Trial Ex. 2, Letter from Sny Island dated August 29, 2008. Plaintiffs assumed that their assessments would not increase by more than $10 per acre, and did not

object to the District's petition before the Pike County Court. On October 9, 2008, the Pike County Court held an evidentiary hearing and confirmed the 2009 proposed assessment and assessment role.

The Railroads filed this suit on April 9, 2009, seeking to enjoin collection of the assessments as discriminatory under the Railroad Revitalization and Regulatory Reform Act (4-R Act), 49 U.S.C. § 11501(b)(4). Complaint (d/e 1). Plaintiffs later filed their Amended Complaint (d/e 18). Defendants moved to dismiss, arguing that, under the Rooker-Feldman doctrine, the Court lacked jurisdiction to hear Plaintiffs' claim. The Court denied Defendants' Motion to Dismiss, holding that the Pike County Court's approval of the proposed assessment constituted a legislative, as opposed to judicial, act. Opinion of May 22, 2009 (d/e 20), p. 12.

On August 18, 2009, the Court in a written Opinion (d/e 27) denied Plaintiffs' Motion for Preliminary Injunction (d/e 8). The Court specifically noted that it could not issue an injunction under 49 U.S.C. § 11501(c) "without evidence of the ratio between true market value and assessed value." Opinion of August 19, 2009, p. 16. The Court later modified part of its August 19, 2009, Opinion and ordered Plaintiffs to pay the disputed

9

assessments into the Court's registry pending resolution of this case. Opinion of September 29, 2009 (d/e 39).

ANALYSIS

In 1976, Congress enacted the 4-R Act to stem the railroad industry's economic decline by barring each state from "discriminating against railroads by taxing railroad property more heavily than other commercial property in the [s]tate." CSX Transp., Inc. v. Ga. State Bd. of Equalization, 552 U.S. 9, 12 (2007); see Dept. of Revenue of Oregon v. ACF Indus., Inc., 510 U.S. 332, 336 (1994); Duluth, Missabe & Iron Range Ry. Co. v. Wisconsin, 100 F.3d 69, 70 (7th Cir. 1996). Under Section 306 of the 4-R Act, codified at 49 U.S.C. § 11501, states may not:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
>
> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11501(b). While the first three paragraphs within subsection (b) relate to property taxes, paragraph (4) is a "catchall" provision. <u>Norfolk Southern Ry. Co. v. Alabama Dept. of Revenue</u>, 550 F.3d 1306, 1311 (11th Cir. 2008); <u>see</u> <u>Burlington Northern R. Co. v. City of Superior</u>, 932 F.2d 1185, 1186 (7th Cir. 1991).

The 4-R Act gives federal district courts the power to prevent states from violating subsection (b) by enjoining discriminatory practices. 49 U.S.C. § 11501(c). However, "[r]elief may be granted under [subsection (c)] *only if* the ratio of the assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." 49 U.S.C. § 11501(c) (emphasis added); <u>see</u> <u>Duluth</u>, 100 F.3d at 70 (noting that railroads "may not obtain relief" without proving assessment-ratio discrimination of at least 5 percent).

Plaintiffs here allege a violation of 49 U.S.C. § 11501(b)(4), the so-called "catchall provision." The Court has already ruled that Sny Island's 2009 maintenance assessment is a "tax" for purposes of the 4-R Act.

Opinion of August 18, 2009, p. 15.  Plaintiffs maintain that the 2009 maintenance assessment is discriminatory, and that the appropriate comparison class is all other landowners within the District.  Defendants argue that the 4-R Act dictates that the relevant comparison class is other industrial and commercial landowners, whom they assessed using the same methodology they used for Plaintiffs.

No matter which position the Court adopts, Plaintiffs have failed to prove a violation of the 4-R Act.  The Court held in its Opinion of August 18, 2009, that evidence of true market value and assessed value is required before the Court can issue an injunction under § 11501(c).  Opinion of August 18, 2009, p. 16-17.  This finding was predicated on a plain reading of the statutory language, which empowers the Court to grant an injunction "only if" it has proof of the 5 percent ratio described in subsection (c).  49 U.S.C. § 11501(c).  The Court has combed the deposition transcripts, hearing transcripts, exhibits, and briefs submitted by the parties throughout the course of this case, and has been unable to locate evidence relating to the true market value of lands within the District.  The Court is not at liberty to ignore the plain language of the 4-R Act, and must conclude that Plaintiffs' claim fails for lack of proof.

The process the commissioners used to develop the 2009 maintenance assessments raises questions about their intent to discriminate against Plaintiffs in imposing a higher assessment burden.  Tending to support an intent to discriminate is Defendants' failure to assess commercial and industrial properties outside of municipal boundaries in the same manner that they assessed RPU lands.  However, as Defendants point out, intent to discriminate is irrelevant under the 4-R Act.  See Burlington Northern R. Co. v. Bair, 815 F.Supp. 1223, 1227 (S.D. Iowa 1993), *aff'd*, 60 F.3d 410 (8th Cir. 1995), *cert. denied*, 516 U.S. 1113 (1996).  Instead, Plaintiffs had the burden of demonstrating discriminatory impact, and they did not do so.  The Court credits Defendants' statement that their failure to assess the six commercial and industrial properties falling outside municipal boundaries in the same manner as other RPU lands for 2009 was inadvertent.  The Court trusts that going forward, the commissioners will assess these properties using the same benefits-based methodology used for RPU lands.

THEREFORE, the Court enters judgment in favor of Defendants, and against Plaintiffs Kansas City Southern Railway Company and Norfolk Southern Railway Company on all issues presented in Plaintiffs' Amended Complaint.  Fourteen days after judgment is entered, the Clerk of Court is

directed to disburse the funds in the Court's registry to Defendants.  See Fed. R. Civ. P. 62(a).  All pending motions are DENIED as MOOT.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:  May 6, 2010

       FOR THE COURT:

                                           s/ Jeanne E. Scott
                                           JEANNE E. SCOTT
                                  UNITED STATES DISTRICT JUDGE